**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| ANDREW DOWNS,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC,<br><br>Defendant. | Case No. 2:26-cv-02142-DCF |

**DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S**
**BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Equifax Information Services LLC ("Equifax"), by and through counsel, respectfully moves this Court to dismiss Plaintiff Andrew Downs' ("Plaintiff") Complaint for failure to state a claim upon which relief can be granted under the Fair Credit Reporting ("FCRA"), 15 U.S.C. 1681, *et. seq*.

## I. INTRODUCTION

Plaintiff brings this action against Equifax under the misplaced belief that it violated the FCRA by providing Plaintiff a copy of his full consumer disclosure which "fail[ed] to provide the account numbers, missing account information and payment history." ECF No. 1, ¶26. Credit reporting agencies only transmit truncated account numbers on consumer disclosures provided to consumers; however, such an action does not result in a violation of the FCRA – or any other law. Equifax's truncation of account numbers complies with the requirements and purposes of the many other laws and the underlying purpose of the FCRA – to protect consumer privacy and credit information from third parties – while also allowing consumers to identify and understand the information on their individual credit files for the purposes which the FCRA provides. Additionally, because Equifax acted with an intent to protect consumers privacy, Plaintiff cannot

show a willful violation of the FCRA and Plaintiff will be unable to show any actual damages because of receiving his consumer disclosure, as required to succeed on an FCRA claim.

Finally, it should be noted that Plaintiff's theory of liability under 1681g is not limited to either this consumer or this jurisdiction. To date, Equifax believes that it has already been served with nearly a dozen complaints making this same, baseless argument. In the majority of cases, much like this one, the plaintiffs are willing to settle, not for un-truncation of account numbers, but financial return and the removal of otherwise accurate, but negative credit history. Equifax is concerned about the legal implications if this court were to hold that account numbers on consumer disclosures are required to untruncated as such would conflict with industry standards and rules as well as potentially impact the privacy and security relating to the financial information of millions of American consumers.

## II. STATEMENT OF THE ISSUES

Whether Plaintiff' Complaint states a claim under the FCRA for which relief may be granted against Equifax.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) requires the Court to dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal, a plaintiff must put forward cognizable factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint will be dismissed where it fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added). Thus, Plaintiff must include enough facts to move "his claims across the line from conceivable to plausible." *Twombly* at 570. Moreover, "[a] plaintiff must provide

'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id* at 555.

To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific task," drawing on the court's "experience and common sense." *Iqbal* at 678-79, 683. This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal* at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown– that the pleader is entitled to relief." *Iqbal*, 556 at 679 (internal quotations and citations omitted). "[M]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (citing *Minn. Majority v. Mansky*, 708 F.3d 1051, 1055 (8th Cir. 2013) (internal citations omitted).

Although *pro se* complaints are entitled to a less stringent standard, Courts "do[es] not … blindly accept the legal conclusions drawn by the pleader from the facts. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). When considering a motion to dismiss for failure to state a claim, "even a pro se plaintiff must allege specific facts sufficient to support ta claim." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985). In other words, a plaintiff must plead a "plausible claim for relief" – one where the claim affirmatively shows "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678-79.

## IV. ARGUMENT AND AUTHORITIES

### a. Case Law Has Not Yet Defined "Clear and Accurate" With Respect to The FCRA, Equifax's Consumer Disclosure Provides An Accurate Depiction Of The Information In Consumer's Files And Provides Enough Clarity For Consumers To Compare The Information With Their Own Files.

Plaintiff argues that truncating sensitive information on consumer disclosures violates the FCRA because Equifax did not clearly and accurately disclose all information on his consumer file. *See* 15 U.S.C. § 1681g(a); *See* ECF No. 1, at ¶ 32. Congress has not defined "clearly and accurately" and there does not appear to be a legal standard for assessing the statutory language of "clear and accurate". *See Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007); *see also Parker v. Equifax Info. Servs., LLC*, Case No. 2:15-cv-14365, 2017 WL 4003437, *4-5 (E.D. Mich. September 12, 2017) (noting that the "legal standard for assessing the type of claim alleged here has not been developed…and the Plaintiff does not offer a standard by which the Court may review whether a disclosure was "clear and accurate" within the meaning of § 1681g). However, what is clear is that the purpose behind § 1681g is to allow the consumer to compare the information in the credit file with their own personal information. *See Wilson v. Equifax Info. Servs.*, Case No. 2:19-cv-00055, 2020 WL 2771184, *6 (D. Nev. May 27, 2020); *see also Gillespie*, 484 F.3d at 941 ("The disclosure must be made in a manner sufficient to allow the consumer to compare the disclosed information from the credit file against the consumer's personal information in order to allow the consumer to determine the accuracy of the information set forth in her credit file").

In any event, it is important to discuss the interpretation of § 1681g in the context of truncation. Because there is no established standard for "clear and accurate," the interpretation should be determined by looking at the FCRA in the context of the credit reporting industry's rules

and standards as well as other related statues regarding consumer protection, privacy and security measures. As discussed below, once the provisions of § 1681g are read in conjunction with its stated purpose in the context of the entire financial and credit reporting industry and statutes regulating Consumer Reporting Agencies, it is a necessary conclusion that truncation of sensitive information does not violate the FCRA and, as a result, Plaintiff's claims fail.

**b. Statutes Identify the Protection of Consumer Financial Information And Consumers' Privacy To Be A Guiding Principle Of All Aspects Of the Financial And Credit Industries.**

As noted above, Plaintiff baldly alleges that truncating account numbers on consumer disclosures violates § 1681g because truncation fails to clearly and accurately disclose all information in the consumer's file. *See* ECF No. 1, at ¶ 32. However, protecting consumer financial information is not a violation of the FCRA. Section 1681g must be read in the light of the overarching, primary purpose of the FCRA: the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681a(4). As discussed above, there is no basis for the claim that truncation of the above-referenced numbers makes the information provided inaccurate in any way, nor is it reasonable to believe that it is unclear – especially when the consumer can review each tradeline as a whole. *See*, *e.g., Bibbs v. Trans Union LLC*, 43 F.3d 331, 343-344 (3rd Cir. 2022) (stating the clarity and accuracy of a tradeline must be determined by reviewing the tradeline as a whole, not just a single data entry); *see also Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020) ("the fact that some user somewhere could possibly squint at a report and imagine a reason to think twice about its subject would not render the report objectively misleading.")

The entire consumer finance and consumer credit industries are bound by one, overarching restraint: consumer information, especially financial-related information, must be protected from disclosure to unauthorized individuals and entities. As consumer reporting agencies ("CRAs") storing billions of pieces of private consumer financial information as well as personal identifying information, Equifax is similarly tasked with ensuring the privacy and protection of consumers and their financial information. CRAs truncate consumer account numbers and Social Security numbers to protect the privacy of individual consumers and prevent identity theft, as provided by these laws and standards.

Truncation of sensitive consumer data is consistent with federal privacy laws. The Gramm-Leach-Bliley Act ("GLBA") was created to mandate that financial institutions have "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C.A. § 6801. The GLBA dictates that financial institutions should establish safeguards to "ensure the security and confidentiality of customer records and information; protect against any anticipated threats or hazards to the security or integrity of such records; and protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer." *Id.* The federal regulations establish a "general prohibition on disclosure of account numbers. [Financial institutions] must not, directly or through an affiliate, disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a consumer's credit card account, deposit account, or transaction account to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer." 16 C.F.R. § 313.12.

In accordance with the GLBA, credit card companies created requirements for all entities it deals with called the Payment Card Industry Data Security Standards ("PCI DSS"). PCI DSS is a set of "technical and operational requirements…developed to encourage and enhance payment account data security and facilitate the broad adoption of consistent data security measures globally." PCI DSS: Requirements and Testing Procedures*,* v4.0.1, 1 (2024). Two of the twelve principles requirements of PCI DSS are (1) Protect Stored Account Data and (2) Protect Cardholder Data with Strong Cryptography During Transmission Over Open, Public Networks. *Id.* The PCI DSS applies to "all entities that store, process, or transmit cardholder data ("CHD") and/or sensitive authentication data ("SAD") or could impact the security of the cardholder data and/or sensitive authentication data." *Id.* at 4. CHD refers to the primary account number ("PAN"), cardholder name, expiration date, or service code. *Id.* The PCI DSS is contractually enforced between card brands and entities storing, processing, or transmitting CHD.

To comply with PCI DSS, PANs must be rendered unreadable by any of the following methods: encryption, truncation, masking, or hashing. *Id.* at 74. The purpose of truncation is to "protect the data if an unauthorized individual gains access to stored data by taking advantage of a vulnerability or misconfiguration of an entity's primary access control." *Id.* at 90. Failure to truncate PANs will result in violations of PCI DSS and the entity will be subject to serious fines. Failure to comply with the PCI DSS will result in a fine ranging from $5,000 to $100,000 per month depending on the length of the company's non-compliance period. *See* Subabrata, *PCI DSS Fines: How Much Will It Cost?*, SPRINTO (Oct. 10, 2024), https://sprinto.com/blog/pci-dss-fines/#causes-of-pci-fines-and-how-much-can-it-cost-you. For non-compliance involving a data breach, the fine can be as high as $500,000 depending on the severity of the violation. *See*

Gowsika, *All You Need to Know About PCI Non Compliance Fee*, SPRINTO (Jan. 8, 2025), https://sprinto.com/blog/pci-non-compliance-fee/.

As a CRA, Equifax is subject to the PCI DSS and must adhere to its standards and are subject to the strictest compliance requirements and may be fined for failing to properly store and protect CHD by not rendering the PANs unreadable through truncation. If Equifax failed to truncate, it would violate its contracts with card brands and consumer financial accounts would be at risk of theft. Also, interpreting the FCRA to require un-truncation of certain sensitive information would, in essence, nullify the efforts taken by financial institutions to mitigate the risk of harm of identity theft and contradict the purpose and goals of GLBA aimed towards protecting consumer information.

Further, the Fair and Accurate Credit Transaction Act ("FACTA"), a 2003 amendment to the FCRA, focused on implementing more responsibilities on creditors, businesses, and credit reporting agencies to protect consumer data. *See generally*, Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108–159, 117 Stat. 1952 (2003). In further amending the FCRA in 2008, Congress intentionally required the truncation of *crediwhitt* card account numbers in the context of credit receipts. *See* 15 U.S.C. § 1681c(g); Credit and Debit Card Receipt Clarification Act (the "Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565 (2008). Congress specifically went on to find that "[e]xperts in the field agree that proper truncation of the card number, by itself as required by the [FCRA], regardless of the inclusion of the expiration date, prevents a potential fraudster from perpetrating identity theft or credit card fraud." *Id.*, at 1566.

Additionally, numerous states have passed consumer protection laws that focus on the privacy of consumer personal and financial information. The California Consumer Privacy Act of 2018 ("CCPA") requires that business follow certain standards and practices when handling

consumer information. *See* Cal. Civil Code § 1798, et seq. Under the CCPA, businesses are required to limit the use and disclosure of consumer information. CRA's and entities that do business in California, are subject to the CCPA and must abide by its requirements for handling private consumer information. Truncating sensitive consumer data is one of many ways in Equifax complies with the consumer protection laws of California. Many other states, such as New York, Massachusetts, Maryland, and Virginia have similar laws protecting against inadvertent disclosure of consumer financial and personal information. *See* Stop Hacks and Improve Electronic Data Security (SHIELD) Act, S. 5575B, 2019 Leg., 2019-2020 Reg. Sess. (Ny. 2019) ("[The SHIELD Act] requires reasonable data security, provides standards tailored to the size of a business, and provides protections from liability for certain entities."); 209 Code of Mass. Reg. 40.00 ("Unfair or deceptive acts or practices in or affecting consumer transactions are unlawful"); Md. Code Regs. 31.16.08 ("Describes conditions under which a licensee may disclose . . . nonpublic personal financial information about individuals to affiliates and nonaffiliated third parties"); Va. Code Ann. tit. 59.1, Ch. 53 (providing consumers with health and financial data privacy protections).

In 2010, the National Institute of Standards and Technology as set by the U.S. Department of Commerce formally opinioned that "an individual's SSN or financial account number is generally more sensitive that an individual's phone number or zip code," recognizing the information as sensitive data field encompassed within the "personally identifiable information," or PII, and encouraging organizations on ways to safekeep such information. *See* Guide to Protecting the Confidentiality of Personally Identifiable Information (PII), Recommendations of the National Institute of Standards and Technology (NIST), Special Publication 800-122, April 2010. <u>NIST SP 800-122, Guide to Protecting the Confidentiality of Personally Identifiable</u>

Information (PII). https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-122.pdf.

The Court in *Whitaker v. Trans Union Corp.* reviewed similar claims regarding this same Advisory Opinion, and determined that "as a matter of law, scrambling or truncating a consumer's account number is a reasonable procedure to protect the consumer's information from potential identity theft." 2005 WL 8160827, *20 (D. Kan. Feb. 3, 2005). The guidance in *Whitaker* is analogous and instructive and provides prudent guidance for resolving the instant matter. Indeed, Judge VanBebber was rightfully not persuaded by the Plaintiff's allegations there, and correctly opined that "holding a credit reporting agency liable for a scrambled or truncated account number that a creditor furnished would lead to absurd results..." *Id.*

At least one court recently reviewed similar allegations in *Lesendro v. Trans Union, LLC*, No. 2:25-cv-128 (D. C.T. Apr. 14, 2025), wherein, upon application for *in forma pauperis*, the *pro se* plaintiffs alleged Trans Union inaccurately reported their account numbers as "incomplete" because they were "missing the last 4 digits." *See Id.* at 2. Upon review of the plaintiff's *in forma pauperis* application, the court *sua sponte* dismissed the action, ruling that:

> Plaintiff alleges no facts which could show that the information and the manner in which it is conveyed make the report 'patently incorrect or . . . misleading in such a way and to such an extent that it can be expected to have an adverse effect,' *Mader*, 56 F.4th at 269 (quoting Shimon, 994 F.3d at 91). Moreover, with respect to the account information, the omission was for the purpose of protecting consumers such as the plaintiff. See, e.g., Compl. (Pl. Ex. 3) at 52 ("For your protection, your account numbers have been partially masked . . . ").

*See Id.* at 6.

In short, Congress, the courts, the government, and a majority of the states have made it a priority for companies that maintain sensitive consumer information to take steps to prevent unauthorized individuals from accessing that same information. Truncating sensitive consumer

information is a reasonable step to prevent fraud against individuals, as noted by all of the above authorities. While the express language of the FCRA does not require truncating sensitive consumer data, its overall focus on consumer protection needs to be considered in its interpretation. Any other interpretation is an invitation to frivolous claims flooding the court system.

c. **Courts Should Interpret the Requirements Of The FCRA Consistent With Consumer Reporting Agencies' Obligations Under Voluminous Other Privacy Regulations.**

Because one of the primary stated purposes of the FCRA is that CRAs "exercise their grave responsibilities with fairness, impartiality and a respect for the consumer's right to privacy," see FCRA § 1681(a)(4), compliance with the FCRA needs to be viewed in the same light as the CRAs' responsibilities under the many aforementioned privacy laws and regulations. As described above, numerous entities, including CRAs, are regulated with the amount of information that they can publish – and many such laws are directed at the account numbers of consumers. The protection of consumers' credit and financial information is paramount in avoiding the epidemic of identity theft and many other forms of financial fraud. The FCRA should be interpreted similarly to allow CRAs to take steps to ensure the protection of consumer privacy.

With the importance of protecting a consumer's privacy as a primary purpose of the FCRA, § 1681g of the FCRA needs to be read with the same principles in mind. While it is true that § 1681g states that a CRA should provide to a consumer "[a]ll information in the consumer's file at the time of the request," that does not include every digit, letter or punctuation that may be connected to the consumer's file – especially information that does not bear on the substance of the credit information recorded.

The Federal Trade Commission ("FTC")[1] interpreted the term "file" in 15 U.S.C. § 1681g to be limited to material included in a consumer report that would be sent to a third party. *See* 40 Years Commentary, p. 71. "[A]ncillary records" such as "a CRA's audit trail of changes it makes in the consumer's file, billing records, or the contents of a consumer relations folder, are not included in the term 'information in the consumer's file.'" *Id.* Said another way, a credit "file" for purposes of § 1681g means "information included *in a consumer report*,"[2] and does not include every piece of information that a consumer reporting agency has on a consumer. *Gillespie*, 482 F.3d at 910 (emphasis added); *Wimberly v. Experian Info. Sols., Inc.*, 2019 U.S. Dist. LEXIS 218104, at *24 (S.D.N.Y. Dec. 17, 2019) (discussing the expansive and narrow definitions of "file" and expanding *Gillespie*, holding that internal record relating to a CRA's processing of information are not a part of the "file"); *see also Shaw v. Experian Info. Solutions, Inc.*, 891 F.3d 749, 761 (9th Cir. 2018); *see also* S. Rep. No. 104-185, at 41 (1995) ("Section 408 explicitly requires consumer reporting agencies to provide, upon request, all information in the consumer's file. The Committee intends this language to ensure that a consumer will receive a copy of that consumer's report, rather than a summary of the information contained therein"). *Gillespie* cites the FTC's commentary on § 1681g(a)(1) regarding the limited scope of the term "file": "[t]he term 'file' denotes all information on the consumer that is recorded and retained by a consumer reporting agency that might be furnished, or has been furnished, in a consumer report on that consumer." *Id.* at 909

[1] The interpretation and enforcement of the FCRA transferred from the FTC to Consumer Financial Protection Bureau ("CFPB") after passage of the Consumer Financial Protection Act of 2010. In preparation for the transition, in July 2011, the FTC published "40 Years of Experience with the Fair Credit Reporting Act – An FTC Staff Report with Summary of Interpretations" ("40 Years Commentary") (available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf) (last accessed 3/16/2026). The CFPB has not issued any contrary interpretation and has cited the 40 Years Commentary in amicus briefs on other topics.

[2] The FCRA defines the term "consumer report" to mean "any written, oral, or other communication of any information by a consumer reporting agency *bearing on a consumer's credit worthiness*…which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit." 15 U.S.C. § 1681a(d)(1)(A))(emphasis supplied).

(quoting 16 C.F.R. pt. 600, app. § 603). "Congress, it seems, chose to limit the right to contest information to material *actually contained in consumer reports*. And, of course, it was free to draw the line as it did." *Gillespie*, 482 F.3d at 910 (emphasis added).

A strict reading of statutory language does not preclude an interpretation of that language – even within the FCRA. "[It is a] fundamental canon of statutory construction that the words of a statute be read in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 492 (2015) (quoting *Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302 (2014)). While the FCRA requires that CRAs "shall follow reasonable procedures to assure maximum possible accuracy of the information," *see* 15 U.S.C. § 1681e(b), Courts have held that "maximum possible accuracy" does not mean complete accuracy, as the concept of "maximum" is elusive. *See*, *e.g.*, *Bibbs v. Trans Union LLC*, 43 F.4th 331, 344 (3d Cir. 2022). If Courts have held that maximum possible accuracy is not the same as complete accuracy, then it is similarly logical that "all information" is not necessarily every single digit of each truncated number – but rather a reasonable provision of all substantive information in the consumer's file produced in a manner that reasonably protects against identity theft and other fraud and provide the consumer with enough identifying information to dispute the account with the CRA which is the primary purpose of communication between the CRA and the consumer under the FCRA. Considering the Court rulings that the FCRA's language to not require a strict and unnuanced reading of the statute, the FCRA's stated purpose in protecting consumer privacy and the litany of both state and federal statutes and regulations that seek to limit exposure of consumer information by redaction of account numbers, CRAs should not be deemed to have violated § 1681g by simply truncating sensitive consumer data. Equifax's Motion should be granted with respect to the truncation complaints surrounding Plaintiff's personal information.

**d. Plaintiff Has Failed to State a Plausible Claim for Relief Under § 1681g of the FCRA.**

Equifax's Motion should be granted because Plaintiff's Complaint does not plausibly allege a violation of § 1681g(a). To state a claim under § 1681g of the FCRA, "a complaint must specify what information is missing from the disclosure or contain specific facts that the plaintiff relied upon to allege that the defendant did not provide all the information in the consumer's file." *Scott v. Equifax, Inc.*, No. 2:20-cv-2516-HLT-JPO, 2021 WL 7209985, *3 (D. Kan. Apr. 21, 2021) (citing *Frazier v. Experian Information Sols., Inc.*, 2018 WL 3785131, at *5-6 (D. Md. 2018); *Scott v. Experian Info. Sols., Inc.*, 2018 WL 3360754, at *7 (S.D. Fla. 2018)).

Here, Plaintiff alleges that his disclosure was missing various account information in addition to payment history. ECF. No. 1, ¶ 12-22. However, beyond providing a vague list of omissions, the Complaint fails to establish what "information" is actually at issue as to any of the accounts, how the accounts should be reporting, or allege *how* the accounts somehow had incomplete payment histories and missing underlying data. *Id.* Absent sufficient factual support, Plaintiff has not plausibly alleged what, if anything, was not disclosed regarding any of the alleged Accounts. *See generally*, ECF No. 1.

**e. Missing Account History and Missing Data Do Not Constitute a Cause of Action Under the Fair Credit Reporting Act.**

Plaintiff alleges that his consumer disclosure contained inaccurate and incomplete account information. ECF No. 1, at ¶ 12-22. Specifically, Plaintiff asserts that the Equifax violated § 1681g Equifax "knowingly provided inaccurate and incomplete information" in his disclosure. ECF No. 1, at ¶ 67.

The fact that certain data is omitted from a report does not necessarily make the report inaccurate. In order for a report to be inaccurate, it must be materially misleading. *See Coleman v. Experian Information Solutions, Inc.*, 655 F. Supp. 3d 1285, 1341 (N.D. Ga. 2023). Materially

misleading reporting means "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *See Frazier v. Dovenmuehle Mortgage, Inc.*, 72 F. 4th 769, 776 (7th Cir. 2023) (citation omitted); *see also*, *Hammer v. Equifax Info. Servs., LLC*, 974 F.3 564, 568 (5th Cir. 2020) (stating that "[b]usinesses relying on credit reports have no reason to believe that a credit report reflects all relevant information on a consumer.").

Conclusory assertions that data was "omitted" merely because certain data fields in a disclosure appear blank are insufficient as a matter of law. *See Dotson v. National Consumer Telecommunications & Utility Exchange, Inc.*, No. CIV-25-1171-SLP, 2026 WL 575337, at *4 (W.D. Okla. Mar. 2, 2026) (citation omitted) (dismissing §1681g claim because plaintiff "offers no factual basis for his belief that NCTUE omitted sub-service types or past due amounts beyond the fact those fields are blank in the disclosure" and blank fields are "too speculative to state a claim").

Here, as in *Dotson*, Plaintiff claims that account information and payment histories were missing from his consumer file disclosure. ECF No. 1, at ¶ 12-22. Additionally, Plaintiff claims that full account numbers, internal account identifiers, and other underlying data were incomplete. *Id.* Yet, Plaintiff fails to set forth even basic facts regarding such allegations. For instance, he doesn't identify what the correct data should be. ECF No. 1. This is a systemic problem throughout Plaintiff's Complaint that plagues each and every allegation of omitted fields for which Plaintiff complains is incomplete. *See generally*, ECF No. 1. Without these basic facts, Plaintiff's allegations are not plausible.

Furthermore, Plaintiff's Complaint does not specify any third party with whom Equifax may have shared his consumer file disclosure; nowhere in the Complaint does Plaintiff state that any creditor was misled by the information contained in or omitted from his report. *See generally*,

ECF No. 1. Plaintiff's only alleged damages are that it "caused [Plaintiff] great frustration and emotional distress when trying to understand his credit report and verify it against his own records." ECF No. 1, at ¶ 34. However, he completely neglects to explain or set forth any facts regarding a credit denial or how the alleged inaccuracies caused him alleged damages. *See generally*, ECF No. 1.

The omission of data fields such as prior payments do not constitute an inaccuracy under the FCRA. *Harris v. TransUnion, LLC*, No. 1:25-CV-192-MLB-JKL, 2025 WL 2270156, at *7 (N.D. Ga. May 23, 2025), report and recommendation adopted, No. 1:25-CV-192-MLB, 2025 WL 2270149 (N.D. Ga. July 30, 2025) (stating that "lack of a comprehensive account or payment history is of no matter, when the report, viewed as a whole, does not mislead the user about the status of the account."); *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1319 (11th Cir. 2018) (stating that "omissions did not render [Plaintiff's] credit report misleading"); *see also Miller v. Trans Union LLC*, No. 3:25-CV-00623-RAH, 2026 WL 473351, at *1 (M.D. Ala. Feb. 19, 2026) ("[B]lank fields (compared to fields that contain for example, "No Data") do not equate to a factual inaccuracy or misleading omission. . . [A] data field, merely because it is blank, does not equate to a factual inaccuracy or misleading omission, let alone a sufficient enough inaccuracy or omission to state a plausible FCRA violation claim.")

Here, Plaintiff baldly alleges that the Equifax violated § 1681g because Plaintiff could not access the accuracy of his file. Since Plaintiff has not properly pled enough facts to plausibly allege that his credit report was inaccurate, nor does he allege that his consumer files were misleading to a third party, his Complaint should be dismissed.

Equifax is "not required to include all existing or derogatory or favorable information about a consumer in their reports." *Davis v. Equifax Info. Servs. LLC*, 346 F. Supp. 2d 1164, 1172

(N.D. Ala. 2004). In any event, the legislative history underlying § 1681g(a) indicates that the FCRA does not require CRAs to provide consumers "their entire files in whatever form maintained by the CRA." *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007) (citation omitted); *see also* Dee Pridgen & Richard M. Alderman, Consumer Credit & the Law § 2:16 (Nov. 2017) ("[T]he FCRA does not require [CRAs] to disclose information that is not given to creditors who request credit reports."); *Joseph v. Experian Info. Sols., Inc.*, No. 1:18-cv-03443-WMR-RGV, 2019 WL 5458009, at *6–9 (N.D. Ga. July 3, 2019), *adopted by* 2019 WL 5460659 (N.D. Ga. Aug. 13, 2019) (rejecting § 1681g claim where plaintiff alleged "there [was] substantial information relating to [him] that is contained in all [CRA] [d]efendants' files that has not been disclosed to him"). Plaintiff asserts that Equifax violated § 1681g by failing to accurately disclose all information in Plaintiff's file. However, the above-referenced authorities make it clear that inclusion of every data point is not required of Equifax. Therefore, for the reasons stated above, Plaintiff fails to state a claim, and the Court should grant the Equifax's Motion.

**f. Any Further Amendment Would be Futile**

Protecting consumer financial information is not actionable under the FCRA. Nor is the omission of certain data fields such as Plaintiff's payment history. "[D]enying leave to amend is "justified by futility when the complaint as amended is still subject to dismissal." *Beckford v. Clarity Servs., Inc.*, No. 8:20-CV-2718-30SPF, 2021 WL 2980534, at *3 (M.D. Fla. July 13, 2021) (citing *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004)).

Plaintiff's pleading deficiencies cannot be cured by any further amendment. Here, Plaintiff cannot plead any plausible factual allegations which would give rise to a right to relief, because the facts Plaintiff admits show there is no liability. Plaintiff acknowledges he asked for and received his consumer disclosure from Equifax. ECF No. 1, Exhibit 1. It is therefore impossible for Plaintiff to show that Equifax had any liability under these facts. Furthermore, he

has already had the opportunity to amend his Complaint and has still failed to state a claim under the FCRA. As such, Plaintiff's Complaint is incurably flawed, and any amendment would be futile. Because Plaintiff has no actionable claim against Equifax, this Court should dismiss Plaintiff's claims with prejudice.

## V. CONCLUSION

For the reasons set forth herein Equifax respectfully request that the Court grant its Motion, dismiss Plaintiff's claims based on 15 U.S.C. §1681g, with prejudice, deny Plaintiff any opportunity to amend his Complaint, and grant Equifax any other just relief that this Court deems proper.

Respectfully submitted,

*/s/ Ralph D. Scott III*

Ralph D. Scott III (#2015127)
Lax, Vaughan, Fortson, Rowe & Threet, P.A.
11300 Cantrell Road, Suite 201
Little Rock, AR 72212
(501) 376-6565 Main
(501) 376-6666 Facsimile
tscott@laxvaughan.com

*Counsel for Defendant*
*Equifax Information Services LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that I served a true and correct copy of the foregoing by e-mail and United States Mail, first-class postage prepaid, upon the following Pro Se Plaintiff:

Andrew Downs
205 N 44th Street
Fort Smith, AR 72903
rushfortsmith@gmail.com

*/s/ Ralph D. Scott III*
Ralph D. Scott III